First case we'll hear this morning is Smith v. Cook. No, excuse me, Logan. Smith v. Cook, it's right, but it's the attorneys. Logan & Kanawha Coal Company v. Detherage Coal Company. Mr. Smith, you are against him in a certain way, right? We are adverse to each other, Your Honor. May it please the Court, I'm Rod Smith. I represent the appellant, Logan & Kanawha Coal Company, LLC. And first of all, I'd like to say it's an honor and a privilege to be before this panel today. Bill Detherage has owned and operated a number of coal companies in eastern Kentucky. And over the years, Logan & Kanawha has negotiated a number of transactions with Mr. Detherage and his entities and entered a number of transactions with them. And on every one of those occasions leading up to the March 2010 transaction that's at issue, Mr. Detherage received standard terms and conditions from Logan & Kanawha that contained an arbitration clause. And on every one of those occasions, that arbitration clause was identical to the arbitration clause that's at issue here. Then in March of 2010, the parties entered another transaction. But, you know, you make it more appealing if you say that in every case, Logan issued a purchase order which on its face referred to terms and conditions. And sometimes they were included and sometimes they were not. But on each occasion, it was Detherage who received the purchase order and engaged in business under that arrangement. Isn't that what your argument is? That is absolutely true, Your Honor. And while Detherage may have been from mine to mine, may have been operating under different companies, he was still, Logan was still issuing the standard purchase order that referred to terms and conditions. And the terms and conditions insofar as arbitration is concerned was always the same. That is your argument. That is my argument, Your Honor. And, you know, the implications of this decision are very important for the coal mining industry in West Virginia and for other industries where the common practice is to transact business through purchase orders similar to this that incorporate other terms and conditions. If the panel were to find against Logan and Kanawha on this issue, it would leave coal mining companies in a position where despite the fact that they've transacted business on a number of occasions and all of the parties understand that terms and conditions, like the arbitration clause, are incorporated into the agreement, it would give parties a gotcha defense where on a single occasion where those terms and conditions aren't included, despite the principle of the company having knowledge that Logan and Kanawha arbitrate disputes or other companies arbitrate disputes. I'm not sure that necessarily follows. I'm not sure that the results would be quite as apocalyptic as you suggest. The problem here is that you said the terms and conditions on the following pages and there were no following pages. So the situation could be addressed simply by providing the following pages that you referred to. I take your point, but I don't know that the consequences of the contrary view are quite as dire as you think. Profound might have been too strong of a term, and the consequences wouldn't be apocalyptic, but the simple matter of the fact is in the coal industry, there are repeat players that engage in transactions with each other on a regular basis. Backs and back and forth forms has occurred in this instance on a regular basis. I completely take your argument in that regard. I did have a question. You're phrasing in your brief that I think the phrase was without inquiring about the terms or informing Ellen Kay that he did not receive them on that occasion. Is the suggestion there that the addendum was sent and somehow not received, or is it in the record that the addendum was sent? Is there any factual context to that in the record? There is no evidence in the record that it was, in fact, sent on that occasion. The purpose for that statement was simply that if Mr. Detheridge or Detheridge Coal did not receive those terms and conditions It should have expected them because it was customary. It was customary, exactly, Your Honor. But there's no finding in the record, as I recall, about the pattern of business between the two parties, or is there? Well, there's not an express finding with respect to the pattern of business between the two parties. However, Judge Goodwin in the district court implicitly made that finding by comparing the two sets of terms and conditions, or the two versions of the terms and conditions might be a better way to phrase that. So that was implicitly found. And because Judge Goodwin, the manner in which he made his finding, it wasn't necessary to make the finding regarding the pattern in practice, or at least he deemed it wasn't necessary. But I don't think it's disputed in any way, and the evidence that's in the record is uncontroverted. And in fact, Detheridge and Coal even acknowledged that pattern. I believe it was on page nine of their brief. Mr. Detheridge, bottom line is Mr. Detheridge and Logan and Kanawha had a longstanding history with each other. Now, there are two key reasons why you should find in Logan and Kanawha's favor with respect to this appeal. The first one is that Detheridge Coal either knew or should have known at the time it entered the March 2010 transaction that that arbitration clause was incorporated by reference. There was a clear reference to the document, as mentioned before, and as the Court is well aware, the parties had engaged in multiple transactions involving the same arbitration clause. And in one manner- I don't hear an argument, and I don't know if you make this explicitly. I must say I think this case is a little bit over-argued in the briefs on both sides. But the letter seeking confirmation of the transaction in May attached the terms and conditions, and so that if a merchant looking at the purchase order, which says this is subject to the standard terms and conditions, didn't know in May, that merchant would have known. Because if there was any doubt about what document was being incorporated, that doubt was resolved in May, and they did continue to conduct business under that transaction thereafter. Absolutely, Your Honor. And that letter actually confirms two things. Number one, because Mr. Detheridge received that letter, Detheridge Coal received that letter and passed it on to its counsel, if it had any objection to the arbitration clause or didn't know of its existence at the time it entered the March agreement, it certainly would have raised that issue. And it also has- Well, I can tell you, I know how they do deals. I actually operated as a purchasing agent for a while, and I tell you, nobody reads anything. You get on the phone and you make your transaction, you follow up with the purchase order, and you throw it in the file. And usually the terms and conditions are on the back, but the idea that people are-he probably knows that disputes are resolved in that industry by arbitration, but it would be over-arguing, I think, to say he was aware of the arbitration clause actually. The question is whether he's imputed with it under the arrangement. Exactly, Your Honor. And one case that we cite in the brief, and you served on the panel in this case in 1991, on Steadower Enterprises versus Armatex. There are facts in that case that are clearly distinguishable, but as I'm sure you recall, in that case, an individual received an arbitration clause on a number of occasions and just filed it away, didn't bother to read it, as you said, the common practices in the industry. And what the court-the court cited a second- You buy an automobile and you don't look at the terms and conditions until you open the glove compartment and look in the book. That's commonly- We usually enforce those, I think, but I'm not sure. Yes, that's commonly the case. But an important aspect of the holding in Steadower Enterprises is it didn't just look at the final deal document that was at issue. Instead, it looked at the course of dealings between the parties. And the court observed that because the parties had entered a number of transactions requiring arbitration, that was the course of dealing of the parties. And the course of dealing argument is really intertwined with the incorporation by reference argument and even the 2207 and 209 arguments. So the one way that the court- Was there an express finding with respect to the course of dealings in Steadower? Pardon? Did the record in Steadower- Was there an express finding by the district court in Steadower as to the course of action? I'm sorry. Excuse me for cutting you off, Your Honor. There was not, and that's one of the ways that- It's our position that the court erred in that the court disregarded the courts of dealing and took a hyper-technical approach by comparing two versions of terms and conditions that had identical arbitration clauses and didn't impute the knowledge that Mr. Detheridge had gained over time to Detheridge Cole. Of course, Mr. Detheridge says that the knowledge that he gained, he gained in an unofficial capacity and therefore shouldn't be imputed to this particular instance. And I think that under basic agency law, I don't think that that's the case. The case that Detheridge Cole relied on for that case, Phoenix Savings and Loan, actually has some language that's pretty favorable for Logan and Kinnall. Yeah, language that wasn't brought to our attention in that brief, which is a little troubling. And I take that case to hold that if an individual has control of a company, that if he gains knowledge either inside or outside of the scope of his employment, then that knowledge is imputed onto that company. And in this case, we don't even have to do the analysis of whether Mr. Detheridge had control of the company because he negotiated all the deals. And so there's no question that he had the knowledge. He negotiated the deals at issue that contained the arbitration clause, and he also negotiated and executed the deal that's at issue before the court today. So I don't think there's any question that that information under basic agency law and West Virginia case law, that that knowledge would be imputed on the corporation. And so that's one reason why I think that the district court erred. Another reason why I think that the district court erred is the district court entirely set aside the heightened merchant standard in this case. And the district court cited to Paragon versus Precision Technology, which is a Western District of Virginia case, but then failed to employ the reasoning or use the reasoning that was used in that case. And that case states, explicit reference to governing terms and conditions as here, puts reasonable people on notice they should read and know these terms. And there's one key statement in Death Ridge Coal's brief that I think this whole case boils down to. And this is, and this is, there's no citation to this, but they state it was understood by Death Ridge Coal that the terms and statements was just boilerplate on the form, which had no effect on the transaction at all. That is not the case. Under the heightened merchant standard in all the cases that we've cited, a merchant has a duty to inquire. And if they made that assumption that those terms and- I think that's an overstatement. He can be bound without inquiring. I mean, there's no doubt you can incorporate, by reference, a document that's not attached or shown or brought to the transaction, as long as the parties know of it and are aware of what's being incorporated. Absolutely, Your Honor.  It's computed to them. Contracts and compromise all the time have terms and conditions people don't read, but we bind the parties when they assent to the papers. If you go into a real estate closing and bought a house, you'd been there a long time if you read the papers and even all the terms. But when you sign, you take the risk of not reading. And I gather that's almost with any contract. The dicey question in this case is not whether terms and conditions can be incorporated in this manner, even if not included. The dicey question is, was it clear which terms and conditions were being incorporated? And that was my suggestion to you, which I thought might be your best argument, is if there were any doubt about what was being incorporated, that doubt was resolved automatically. Yet the parties continued without objection to perform the contract. Absolutely, Your Honor. I suppose, but aren't you, I guess you're arguing also that if there was any doubt about which set of terms and conditions were incorporated, at that point perhaps there was a duty to inquire. Yes, or if you don't do so and if you make the assumption that Death Ridge Coal did, then you do so at your own peril and you're stuck with the terms and conditions that do apply. You know, in closing. If you're curious. If you're curious. If you're curious. But if you're not curious, you're put on notice that you're going to be bound. Absolutely. Because the language said subject to terms and conditions. Absolutely. And with respect to what the district, or if the court finds in Logan and Cannell's favor what it should do, Death Ridge Coal argues that it should be remanded for a purpose of, I see that I'm out of time. I'll address that issue in my rebuttal. Mr. Cook. Thank you. You're the other party to this transaction that I announced in the beginning.  Thank you, Your Honors. Good morning. Your Honors, with me is Mr. Bagnell. Let me take from your questions that one issue we have in this case is exactly what were the prior relations between the parties, not between the parties, but between companies controlled by Mr. Death Ridge. I was heading with my questions and I'm not speaking for my colleagues here. The purchase order, which is the common way business is done, said this is subject to standard terms and conditions, whatever it said, pretty clearly on the front. If somebody were curious about it, it was there. The question then is what terms and conditions were being applied. And there's a couple of ways to handle it. One is Death Ridge dealt with Logan over a period of years. And the same arbitration clause, slightly different terms and conditions were attached, but they were always in the same, roughly same form from Logan. And he knows what's in there, if that were important. And I can tell you, for these people dealing in day-to-day commerce, I know it's not important. But if they thought it was important, he could make an inquiry. He's a merchant. And so the question is, what was being incorporated? If there's any doubt, you can look one of two places. You can look at the course of dealing or you look to the mail letter. And those are the two arguments I personally think you have to address. But I think it's pretty clear you can incorporate terms and conditions without actually attaching them. Your Honor, what I would say to that is that the two factual premises on the basis of which the argument of Logan Kanawha rests are incorrect. The purchase order that got signed did not incorporate standard terms and conditions from Logan Kanawha's purchase order. The purchase order that got signed said, rather ungrammatically, all terms and conditions on the following pages are into and made part of this contract. Now, how are you going to read that? You get a fax. They're dealing very, this is not a closing to buy real estate. This is engaging day-to-day commerce between merchants. You get a purchase order with the cover sheet and then the two attached pages aren't attached. Do you think there was an attempt to abandon that? Is that the argument? That's pretty unrealistic. No, Your Honor. Here's what happened. What happened is that Logan and Kanawha sent an unsigned purchase order to Mr. Detheridge with a fax that said, attached as a PO draft. Let me know if it's okay or your request changes. Clearly, there was nothing attached. It was just a one-page purchase order. Mr. Detheridge made a little change in the terms of the contract. From $10,000 to $7,000. And sent it back. Again, with no pages attached. That was the offer. It doesn't have to have pages attached. It has to specifically reference the document to be incorporated and it does not. Logan and Kanawha signed the purchase order, sent it back and said, we have a deal. Well, the question is, what deal do we have? But that does seem to amount to hair splitting when arguably it might have been one of two documents, but both of them contained an arbitration provision. I think we're making the assumption that there was a pattern of business between the parties. Do you acknowledge that there was a pattern of business? No, Your Honor. Your Honor, what I acknowledge is that Logan and Kanawha had sent purchase orders that did have these purchase orders, these terms attached. That is a pattern. You acknowledge that there had been communications of this sort that included the agreement, including the arbitration provisions in the past. Why is that not a pattern? I'll describe it. Let me say it this way. There were four, Logan and Kanawha briefs says that there were four transactions between the parties in which these standard terms and conditions were attached. I didn't say the parties. I said with Bill Deathridge. Yes, Your Honor. That's right. Companies owned by Bill Deathridge. Bill Deathridge was functioning on behalf of these different mines which had different corporate names. Actually, Your Honor, there was only one previous contract between the parties. There were proposed contracts, but only one previous contract between the parties. That was done in 2006, four years before this transaction. That purchase order contained no reference whatsoever to standard terms and conditions. There was no incorporation language in that purchase order at all. Now, there were a couple of additional purchase orders proposed between the parties. Mr. Deathridge never signed them. There was never a transaction based on those purchase orders. I would like to point out, Your Honor, that from the transcript of the arbitration, here's what the witness for Logan and Kanawha said. He said what was Exhibit No. 29, which is purchase order. Does Logan and Kanawha have any documents confirming that Patrick Processing, one of the other companies owned by Mr. Deathridge, received the terms and conditions on this occasion? No. By the way, I might add, this particular agreement was never consummated because Mr. Deathridge planned to ship coal from the Alma Mine while the Pond Creek Mine, which was also known as the Meehouse Mine, was downed by installed seals. They go on to Exhibit No. 30. Could you turn your attention to Exhibit No. 30, please? This is a proposed purchase order of coal from Patrick Processing. Is that correct? It's correct. Did this purchase order get sent to Mr. Deathridge? Yes, it did. And how do you know that? Again, by the fax number on the lower corner. Is it your belief that the terms and conditions were attached to this purchase order? Again, this proposed purchase order. The witness says it's my belief that our standard procedure was attached every time we sent a new order. You can't be 100% certain? No, I can't. I cannot verify that. Okay. And if we would have had discovery responses from Deathridge Coal on this subject, then you would have been 100% certain as to whether they received the terms and conditions or not, right? I would think so. They would have showed us their documents. There's a very good chance that the terms and conditions would have been attached to this purchase order. Then counsel for Logan and Kanawha invites the arbitrators to take a negative inference from the fact that Deathridge did not participate in discovery, that, in fact, if he participated in discovery, that this particular purchase order would have been shown to have the standard terms and conditions attached. And, in fact, the two arbitrators that participated in the proceeding said, after discussion, the panel will rule it. The inference asked by the claimant with respect to terms and conditions will be granted. Two-to-one decision of the panel, and we can move forward from there. So the prior transactions, which have so been the focus of the Logan and Kanawha briefs, consisted of one transaction four years before, which had no incorporation by reference terms whatsoever. What's page 192 of the JA? I see a purchase order from Logan addressed to Patrick, attention, Bill Deathridge. Page 193, another one from Logan to Patrick, attention, Bill Deathridge. And both those say all terms and conditions on the following pages are into and made a part of this contract. Those were not consummated. Those were not contracts. And there were no coal ships? No. How do we know that? From the testimony that was attached to the Logan and Kanawha response to the motion to vacate arbitration award, part of which I just read to you, which concerned these two. Is it disputed that Deathridge got those, received them? I doubt it. The Logan and Kanawha witness says he sent them. He says, with respect to one of them, in the testimony that I just read, I can't prove that it had those terms and conditions attached. How about the May letter when they sought confirmation of the contract? Were the terms and conditions attached there? Yes, Your Honor, they were. But that was after the contract was already formed. Well, except that the contract was formed incorporating by reference terms and conditions. And they just weren't attached. But when they confirmed it, they had the attached pages. And after that, coal was shipped. No, Your Honor, that May 11th letter was not a confirmation of the contract. That May 11th letter was a demand for adequate assurances, a notice of default. The difference is that a contract was already formed. The contract was formed on the purchase. But the contract, when formed, referred to terms and conditions on the face. The purchase order referred to terms and conditions. And they weren't attached. Now, if there were any doubt what those terms and conditions were, it was filled in in May. Now, if Deathridge got that May thing and said, oh, those aren't the terms and conditions, I never got that, I would have never agreed. Instead, he shipped coal. Your Honor, the 2207 deals with confirmations of the contract that are part of the formation of the contract between the parties. That's not what this was. I understand, but I'm suggesting to you that a contract, a purchase order, can refer to documents and incorporate them by reference without actually attaching them. Absolutely, Your Honor. All right. Now, if that's so, then the only question is what was being incorporated. And you're suggesting there's a lot of doubt about what was being incorporated. I'm suggesting that there's two reasons why there isn't a lot of doubt. One is they had attached them, actually, in prior transactions, which are in the record. Or maybe they weren't completed transactions, but at least he got the purchase order and he got the terms and conditions. And number two, when they sought assurances under this contract, they attached what had been referred to, and there was no protest about it. No, Your Honor. But he already had a duty to go under the purchase order. I'm not suggesting the May was a new contract. I'm suggesting the May was a demand for performance under an existing contract. And because the purchase order didn't have the terms and conditions, there could be a question as to what they referred to. I don't think there was a lot, but if there was a question, the May letter answered the question. It may have answered the question, but it didn't change the terms of the contract that the parties entered into. And that's the issue. What contract did the parties enter into? And that contract was formed when the purchase orders were signed and exchanged. That really is ignoring the incorporation. I mean, you can't read that out of existence. You can't read the reference to another document out of existence. I think that has to be your position, and that's a bit of a stretch. But at some point I have a question about relief that I would like you to address when you and Judge Niemeyer. No, it's fine. I've expressed where I think the difficulties are, and your suggestion is just what Judge Duncan has clarified. In order to take the position that the March contract didn't include the terms and conditions, you have to be arguing that they had to be attached in order to be incorporated. Or specifically referenced. They were specifically. Your Honor, in all due respect, I disagree. What the contract at sign says is all terms and conditions on the following pages are into and made part of the contract. Now, did Mr. Dethridge have any doubt what was being incorporated? I don't know. There's nothing in the record that suggests one way or the other. No, but a person would clearly know in his position he'd dealt with the company over five years or something, he'd seen other documents, and then he received the very same ones, the same arbitration clause at least, in May. And those were terms and conditions, weren't they? They were terms and conditions in contracts that didn't get signed. Your Honor, I agree with you. Let's talk about the May contract now. Those terms and conditions were attached. If you didn't think that those terms and conditions were made a part of the original contract, don't you think he at least had an obligation to say something then? And had he said something then, how would that have changed the contract? Well, at least the parties would have been on notice as to the fact that there was a dispute regarding the terms and conditions, and nothing was said. They were on notice soon enough about that, but my point is, what would have changed about the contract? The contract was formed in March, and the contract clearly referred to terms and conditions. It wasn't just that page, it referred to something else. The only thing you can raise about that March contract is what were the terms and conditions. But you cannot say there were no terms and conditions. You just have to argue which were they. And the suggestion I'm making is that if there were any doubt, the May letter said these are the ones we agreed to in March. Now, Deathridge gets that letter, and he doesn't say, oh, no, we didn't reach those. Those weren't the terms and conditions. The terms and conditions I referred to was a little single-page, three-paragraph document. Now we would have had a dispute. But instead, he just went ahead and shipped coal. Your Honor, I agree with what you said during the Council's opening argument. In this business, and in many businesses, people don't read the contracts. That doesn't mean they're not bound by what they sign. And what they signed here referred to documents that weren't attached. We wouldn't be talking about incorporation by reference if they had been attached. The doctrine of incorporation by reference, by its terms, relies on things that are not a part of the original document. And that's... But I do have a question about relief. We are here on... The question before us is whether or not to confirm an arbitration award, correct? The question... to affirm the judge's decision that vacated... The question is... The issue presented to the district court was confirmation of the arbitration award. Isn't that correct? That's correct, Your Honor. You did not challenge the arbitration award? Your Honor, we filed our own motion to vacate the arbitration award, and the lower court vacated the arbitration award. In the context of a confirmation on the back end, district courts get to look at arbitration awards in two contexts. A challenge to whether or not the dispute is arbitrable on the front end, and then whether it should be confirmed on the back end, and whether it should be confirmed is subject to a significantly more stringent analysis. And my question is, if we don't agree with you, why do you think you should get a second arbitration? Because... Because I understand that to be your position. Yes, Your Honor. Because in the first instance,  was to be an arbitration at all, whether there was an arbitration agreement between the parties. There was an arbitration, and we are here looking at whether or not that arbitration agreement should be confirmed. The question of whether, it seems to me that the train has left the station on whether or not there should be an arbitration, and there has been an arbitration. To answer your question, Your Honor, and of course I've recited the cases that suggest that in the first instance, the question of whether there's an arbitration agreement is for the court. That is absolutely correct, but we're beyond that. There has been an arbitration, and what we have before us is whether or not, the question is whether or not the arbitration agreement should be confirmed. There has been an arbitration. The arbitrator found that the dispute was arbitrable, but now we have an arbitration agreement, and the question is whether or not it should be confirmed. So why should you get the benefit of a second arbitration? Because we didn't participate in the first. But that was your choice. You chose not to participate in the first arbitration. Why do you get a second bite at that apple? Well, because, again, in the first instance, the issue is for the court. That's gone. But you didn't ask the court to stay it. You could have asked the court to stay the arbitration based on the lack of contract. But you didn't choose to go that route. You just didn't show. We did not, Your Honor. Our hope was that the arbitration wouldn't go forward. Well, it did. It did. And now you're sort of stuck with that. So the question is, now that there has been an arbitration, and the question is not whether there should be an arbitration, but whether to confirm the arbitration, if we disagree with you, why we would not confirm the arbitration? I suppose the question is, who has the burden of the arbitration? No, no, that's not my question. Because it was on Logan and Kanawha to seek enforcement of the arbitration. That's what they did. The issue is whether to confirm. There has been an arbitration. You have to get beyond the question of whether it was arbitrable in the first instance, The usual way to address the issue of what you're raising is to enjoin the arbitration in a court, before it's a head, or to seek a stay of some kind. And at that point, you raised the reason the arbitration shouldn't go ahead, because there's no contract to arbitrate. But the arbitration did go ahead. As a matter of fact, you selected the arbitrator, and then they didn't attend. And the only ground you raised on the confirmation process, again, was a contractual issue. So you've narrowed your challenge to the contractual issue, but I think Judge Duncan's question is, you really didn't raise any issue about the substance or the merits of the arbitration itself. And the court didn't, it wasn't presented to the district court, so we would have no choice but to confirm the arbitration if we ruled against you on the contract issue. If I understand your questions, Your Honor, it boils down to this. Does the advocate of arbitration have a duty to compel arbitration? That's not the issue at all. The issue before us is whether to confirm the arbitration award once it has been entered. The burden to compel in the first instance is off the table. You didn't challenge that in the first instance. You only challenged the confirmation of the arbitration award. Again, I think I'm having trouble, we're having trouble communicating here, Your Honor. No, I think I understand you completely. It simply isn't the issue. Let me ask you this. If they said, let's go to arbitration, and you wrote a letter back and say, no, we're not going to arbitrate because we have no obligation to. Then I would think they would go to court and file a motion to compel arbitration under the Federal Arbitration Act. In this case, they said, let's go to arbitration, and you said, okay, here's my arbitrator, and you helped designate it, and they scheduled it. And then you simply didn't show. So there was never a suggestion that they had to go to court to compel arbitration until you didn't show it. Is that about it? No, Your Honor. Okay. In fact, there was a letter written by Mr. Cave which said, and I'm trying to find it here, that said, I understand you're demanding arbitration. I don't know that there's an arbitration clause in this contract. I don't want to be defaulted. Can you please send me proof that you have an arbitration clause in your contracts with my client? In the meantime, we'll preserve our rights, but in particular, we are not waiving our claim that there's no arbitration whatsoever. That was the first response. That is preserved. And so you did, because we're arguing that now, but you had a right to challenge the contract, and if that would wipe it all out, then you'd be all right. But if you lost on that, you went ahead with the process up to a point, reserving the right to challenge it in the end, but then you didn't show up. There was lots of give and take between the parties up to the time of the arbitration. The only thing that we did positively was appoint an arbitrator because our first reaction was there's not an arbitration clause, but we don't want to prejudice our rights in the event there is one, so we're going to appoint an arbitrator. But at what point did you challenge the arbitrability? At every point after that, Your Honor. Not before the arbitrator. We did not appear at the arbitration, Your Honor, because we didn't believe that the parties had agreed to arbitrate. Where's your letter responding to the request for arbitration? Where's that in the appendix? Your Honor, I believe it's Exhibit 4 to our... What page in the appendix? Your Honor, I don't have a site to the appendix. It is a January 10, 2011 letter from Mr. Cave to Mr. Glasser. That doesn't help me here. You made a statement that you were concerned about defaulting your rights. It seems odd that having been concerned about that, you wouldn't show up at the very hearing where your rights were being adjudicated. But wouldn't that be tantamount to agreeing that the arbitrators had the authority to make the decision? Well, it was either that or, as my colleagues have indicated, take some affirmative action to stop the arbitration in its tracks. But not showing up seems patently inconsistent with the preservation of rights. That was the decision that this particular lawyer made, Your Honor, and it makes perfect sense to me. If you believe that the arbitrators have no jurisdiction, you don't show up. The letter you just referred to, that's why I was looking for it. The letter you referred to said we want to reserve our right to challenge it, which doesn't say we don't want it to go ahead. And it seemed to me, as a matter of law, you do reserve the right because it's a contractual matter for the court. And you can raise that later in addition to any other objections. You may have found that the selection of arbitrators was inappropriate or there was a bias or whatever. You couldn't challenge, I suppose, the actual dollar amount. That would be pretty hard to challenge unless there was just simply no evidence. We did not present evidence. We did not present witnesses. We did not appear. And we did not, Your Honor, seek to stay the arbitration. On the other hand, I would argue, in the cases I think cited in my brief would stand for this proposition that the onus is on the supporter of the arbitration to stay the arbitration. Yeah. I mean, they took the bird they needed to take. They compelled arbitration and you designated an arbitrator. And that's the only thing that we did. And that because... Well, you also chose not to show up at the arbitration agreement, which, as Judge Diaz suggested, is certainly an ambivalent message. The Deathrish Coal Sales Company had a more than a colorable argument that there was no agreement to arbitrate. And they chose not to appear at the arbitration to incur that expense, hoping that the arbitration would not go forward and understanding that... What reason would you have to hope that the... What reason would you have to think that the arbitration might not go forward? Because there was no agreement to arbitrate. In your opinion. Well, in my opinion. In the opinion of Deathrish Coal. But clearly it wasn't the opinion of Logan and Kanawha. Yes, Your Honor, I understand. Let me say this. I'm veering the argument back to the question of whether there was an agreement to arbitrate. Your Honor, the contract said, and the contract was first signed by Mr. Deathrish, so he was the offeror, if you will. The contract said, all terms and conditions on the following pages are into and made a part of this contract. That was the purchase order that Mr. Deathrish sent. He got a fact saying, we've got a deal. The question is, I mean, there is no general understanding in the Uniform Commercial Code that parties have the duty to be smart about what they do. They don't. Just let me ask you, we have a deal. And the deal, you agree, was based on that purchase order, right? Yes, Your Honor. As modified. It was modified to 7,000 tons. Yes, Your Honor. And on that very document, it says it refers to terms and conditions, doesn't it? It refers to the following pages. Right, and so that was part of the deal. To have terms and conditions applicable. The law is that unless the incorporation refers to a specific document. Okay, so that's got to be your argument. It's not that they didn't agree to terms and conditions. The question is, what terms and conditions? And your argument is it's not specific enough to point to. Isn't that got to be the argument? It is, Your Honor. Is there any other? Well, what Mr. Dethridge did was sign this thing and send it back and say, this is the contract. I'm surprised it wasn't called. I understand, but on the face of the contract, it says in bold capital letters, this is subject to terms and conditions. It's subject to the following pages, and there were no following pages. The Logan and Kanawha person signed that and sent it back. Did he have a duty to acquire? What's the agreement there? If it says subject to terms and conditions attached. And it doesn't, the terms and conditions which are attached, I don't know what the exact one is. It says terms and conditions on the following pages. Yeah. And no following pages were attached. Right. I think the deal is. So your argument is that's just a nullity. Yes, Your Honor. Or that there can never be incorporation by reference. No, Your Honor. There can be incorporation by reference if it's specific. But that's, the question was, is there another argument? Granted that that's your argument, I think the question was, is there another one? Well, there is another argument, that it was Logan and Kanawha's duty to inquire about what pages Mr. Deathridge meant, or that it was Logan and Kanawha's duty to make certain. Well, Mr. Deathridge didn't refer to them. The form purchase order came from Logan, and Deathridge read to it. Signed by Deathridge first. Sure. Signed by Deathridge first, and then sent back. The timing doesn't matter. The form was initiated by Logan as a purchase order to buy coal. Deathridge agreed to it, subject to 7,000 tons. Correct. Logan said, that change is fine with me, and they went ahead. You've got a deal. And there was a performance problem, and so then Logan says, you're not performing. And they sent a copy of the very same agreement again, and say perform. And so after that, Deathridge starts to perform. Because he had an agreement to ship the coal. That silence was not an affirmation of the terms that Logan and Kanawha wanted to read into the agreement. So you want us to read out of the purchase order, that line that refers to terms and conditions. I want this court to say that unless the terms of incorporation are clear, and refer to a specific document. They say it does refer to a specific document. It refers to their standard terms and conditions. Which they say, Mr. Deathridge had a prior history with them that would have led him to understand this. That's where he learns about it. The question is whether there's even a doctrine of incorporation here. And they say it refers to our standard terms and conditions. Now the question is, would Mr. Deathridge conclude that there are no terms and conditions? Your Honor, there's nothing in the record. There were none attached, but would he say there are none? I don't know what he would say. There's nothing in the record about that. Well, I'm talking about a reasonable argument in terms of merchants dealing in day-to-day activities. But the code is intended to facilitate commerce. And the ideas, the main things you want written down is quantity, price, and shipment. But the terms and conditions, if they've been dealing, I mean we can just get to a more extreme case, if they're dealing daily, daily, for three years on purchase orders. They're buying supplies daily. And half of the purchase orders had the terms and conditions attached, and half didn't. That would be a different case, Your Honor. Of course, but what's the principle that governs the ones that didn't have the terms attached? The principle that governs this? No, no, my hypothetical. What is the principle that makes the terms and conditions applicable to the purchase orders which did not have the terms attached? Course of dealing, I suppose. Okay. You suppose? Yes, Your Honor. I think you've got to ask yourself the question. In each of those contracts that did not have the purchase orders, did not have the terms and conditions attached, can you say that there was an incorporation specifically to those provisions? I'm saying there were 365 purchase orders, half of them attached the terms and conditions and half didn't, and all of them had the language that's in this one. That's a much different case than this one, Your Honor. Okay, give me the answer to that case.  Probably? Probably, yes, Your Honor. What is the principle by which you would apply the terms and conditions in the purchase orders where they were not attached? That at some point where the parties have a course of dealing and they understand what the contracts are supposed to say. The answer is a course of dealing. A course of dealing, yes. Okay. Which was not present in this case. All right, thank you, Mr. Cook. Thank you, Your Honor. We're giving each other a lesson on arbitration here. All right, Mr. Smith. I will first address, you know, what you should do if you roll in Logan Hall's favor on this issue. Let me guess. You would like us to confirm the arbitration? Absolutely, and for a policy reason. Pardon? Where's the letter he refers to in the JA? He said there was a reservation of the right to challenge this. Is that a January 10th or 11th? Let's see. Let's see. I think he's referring to a January 10th letter that's on page 80. 80? Of the appendix, yes, sir. Is that the letter that you're referring to? It's a letter from Stanton Cave to Brian Glasser. And Stanton Cave is his Logan or Death Ridge Coles prior counsel, and Brian Glasser is my law partner. All right, that doesn't say anything. That's just saying I'll get back to you, basically. Okay. Is there another letter? He's asking for the documentation. On page 85. Okay. There is a January 12th letter that is to Melanie Cabrera, who is a case manager for the AAA. It's the naming of the arbitrator on this one, and he says, without consenting to arbitration, without waiving defenses and rights. So he actually is proceeding to go ahead. He says, without consenting and without waiving defenses and rights available to avoid prejudice, Death Ridge does hereby designate the following individual as an arbitrator. And is there any other follow-up? Is there any suggestion that we're not going to go ahead with the arbitration? I don't recall any letter to that effect. My recollection is they never said they weren't going to go forward with the arbitration. There was a communication that said that they weren't going to actually appear and enter evidence during the arbitration. But what I think is important is what they actually did do. As you pointed out, they appointed an arbitrator. They actually engaged in written discovery. Well, I was trying to explore the issue of whether you had to move to compel arbitration. Did they tell you clearly enough they weren't going to be there, so you compel it? And that letter didn't seem to say they weren't going to be there. No. They said they were reserving their right, or without prejudice to that right. We were informed prior to the arbitration itself, a matter of days before, that they weren't going to attend the arbitration. But they didn't put us on notice that we'd have to compel the arbitration or that their selected arbitrator wouldn't be present. Letter or fax or email? Your Honor, I don't recall. Do you think it matters? It's not clear to me that it makes a huge difference because it gets back to the differing standards. The federal courts get involved in arbitration, which is supposed to simplify and expedite matters, at one of two points, either at the front end, when there's a challenge to proceeding to arbitration, or at the back end, when you have the award presented to the court for confirmation. It wasn't challenged at the front end before the arbitration commenced, and that would have to be done by the party who was objecting to the arbitration, it seems to me. Otherwise, it frustrates the purpose of arbitration and it gives the party who objects two opportunities to make the same objection. Well, I'll take the risk, I'll just stay home, see what happens, and when I get to the back end, get a second bite at arbitration, which can't have been what the Federal Arbitration Act contemplated. I would imagine you agree with me. I absolutely agree with you, and this case is a more extreme example of that than most cases, in that they were involved in every aspect of the arbitration, submitted the issue of arbitrability to the arbitrator, engaged in pre-arbitration briefing, post-arbitration briefing. The only aspect they didn't avail themselves of, or the only right they didn't avail themselves of, was to actually show up for the arbitration. You say pre-arbitration briefing? There was pre-arbitration briefing. Submitted to the arbitrator? Yes. By Deathridge? By Deathridge. I believe that there was. But they... I mean, the bottom line is, I think that you're absolutely right, is were you to submit... Page 89. Page 89. So had they instead, in response to your demand, made you aware right from the get-go that they were not consenting to arbitration, would that have been enough to stop the arbitration in its tracks? Absolutely not. The communications were with respect to a dispute over the arbitrability. No, no, no, but I'm suggesting to you if in fact they had... We're not going to select arbitrators, we're not going to brief, we're not going to do anything, we're not consenting, period. And somehow the arbitration goes forward. Do we have a different result? I don't think so. And the reason for that is... At some point... The arbitration might be considered to be a rogue process. That seems to me an easier case, but that's not what we have here. It is certainly not what we have here. And even in that case, I think it would be a more difficult question, but even in that case, Deathridge Coal would have had the right to put the issue to the district court at that time. The right or the obligation? The right and the obligation. And in this case... They asked for discovery too. They produced discovery, yes sir. In the arbitration for them? Yes. So they designated an arbitrator, they requested and were given discovery, they filed a memorandum with the arbitrator and asked that the arbitration be dismissed. That's what they said in the last line. Yes. And the arbitrator took that as part of the thing and refused to dismiss it That's absolutely accurate, Your Honor. Anything else? I see your light's red. No, Your Honor. As I said before, it is an honor and a privilege to be before you today and I appreciate your time and your patience on this issue.
judges: Paul V. Niemeyer, Allyson K. Duncan, Albert Diaz